1
2
3
4
5
6
7

8                      UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  LARISSA ARAUJO (SURVIVAL ACTION), et al., | Case No.: 20-cv-01800-AJB-RBM |
| 12                          Plaintiffs, | **ORDER:** |
| 13  v. | |
| 14  COACHELLA VALLEY WATER | **(1) GRANTING COACHELLA VALLEY WATER DISTRICT'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. DAVID FRACTOR;** |
| 15  DISTRICT; THE COUNTY OF IMPERIAL; JOSUE GONZALEZ; and | |
| 16  DOES 1 TO 25, inclusive, | |
| 17                          Defendants. | **(2) GRANTING IN PART AND DENYING IN PART THE COUNTY'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. ILENE ZACKOWITZ;** |
| 18  COACHELLA VALLEY WATER DISTRICT, | |
| 19 | |
| 20                  Cross-Complainant, | |
| 21  v. | **(3) DENYING THE COUNTY'S MOTION TO EXCLUDE EXPERT OPINIONS OF DAVID CASTEEL AND ROBERT THOMPSON;** |
| 22  ANDRE DOS-SANTOS DE-SA, an individual; COUNTY OF IMPERIAL, a | |
| 23  Public Entity; and DOES 1-10, inclusive, | |
| 24 | **(4) GRANTING THE COUNTY'S MOTION TO EXCLUDE EXPERT OPINIONS OF EDWARD RUZAK;** |
| 25                  Cross-Defendants. | |
| 26 | |
| 27 | **(5) DENYING THE COUNTY'S** |
| 28 | |

1

**MOTION TO EXCLUDE EXPERT OPINIONS OF REZA MARSHAL;**

**(6) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE KIMLEY-HORN STUDY; AND**

**(7) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT**

**(Doc. Nos. 103, 104, 105, 106, 107, 109, 110)**

Presently before the Court are several motions to exclude expert opinions and studies, (Doc. Nos. 103–107, 110), and Plaintiffs' Larissa Araujo (Survival Action), Jose Carlos De Araujo, Helenilza Maria Oliveira De Araujo, Andressa Dos Santos (Survival Action), Renato Dos Santos, and Maria Tereza De Carvalho's ("Plaintiffs") motion for partial summary judgment, (Doc. No. 109). These motions are suitable for determination on the papers and without oral argument in accordance with Local Civil Rule 7.1.d.1. Accordingly, the Court hereby **VACATES** the hearing currently set for **September 15, 2022 at 2:00 p.m.** As set forth below, the Court **GRANTS** Coachella Valley Water District's ("CVWD") motion to exclude Fractor, **GRANTS IN PART AND DENIES IN PART** the County's motion to exclude Zackowitz, **DENIES** the County's motion to exclude Casteel, Thompson, and Marshal, **GRANTS** the County's motion to exclude Ruzak, **DENIES** Plaintiffs' motion to exclude the Kimley-Horn study, and **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for partial summary judgment.

## I.    BACKGROUND

This action arises out of a tragic accident that occurred in unincorporated Imperial County. On October 2, 2019, Cross-Defendant Andre Dos Santos De-Sa was driving a Hyundai Elantra when he, along with Plaintiffs Larissa Araujo and Andressa Dos Santos,

were involved in a two-car, broadside collision with a van driven by Defendant Josue Gonzalez, an employee of Defendant CVWD. (Doc. No. 109-1 at 9.) The automobile accident resulted in the deaths of Larissa Araujo and Andressa Dos Santos. (*Id.* at 10.)

At the time of the collision, Defendant Gonzalez was driving a Ford E350 Super Duty van southbound on English Road, while Plaintiffs were heading westbound on Schrimpf Road. (*Id.* at 9.) Where these two roads intersect, both English Road and Schrimpf Road are unpaved, graded dirt roads. (*Id.* at 8.) There were no stop signs or other traffic controls to indicate an intersection was approaching. (*Id.* at 10.) Thus, English Road and Schrimpf Road were two perpendicular roads that intersected without any controls regulating cross-traffic. (*Id.*) At the time of the collision, there were no posted speed limit signs at this intersection. (*Id.*) Thus, pursuant to California Vehicle Code § 22349(b), the speed limit was 55 mph. (*Id.* at 11.)

Approximately 73 feet northeast of the intersection, there is a dirt berm approximately five feet high. (Doc. No. 115 at 6.) While Mr. De-Sa was driving west on Schrimpf, the dirt berm was to his right/north, while the berm was to Defendant Gonzalez's left/east as he drove south. (Doc. No. 109-1 at 11.) In 2014, this berm was designed and constructed by Imperial Irrigation District ("IID") as part of its Managed Marsh Complex, Phase 2. (Doc. No. 115 at 6.)

In the 5 seconds before the collision, Mr. De-Sa's Hyundai was traveling at 56 mph. (*Id.*) From 4 to 2 seconds before the collision, the Hyundai slowed from 55 mph to 47 mph. (*Id.*) Then, in the 1.5 seconds to 1 second before the collision, the Hyundai was traveling 46 mph. (*Id.*) Meanwhile, Defendant Gonzalez's Ford maintained a constant speed between 59.0 and 60.9 mph and never slowed or activated its brakes before the collision. (*Id.*) Mr. De-Sa's Hyundai entered the intersection first and was thereafter hit by Defendant Gonzalez's Ford. (*Id.*)

On October 15, 2021, the County filed a motion for summary judgment. (Doc. No. 59.) On January 14, 2022, the Court denied the County's motion. (Doc. No. 93.) Plaintiffs filed the instant partial motion for summary judgment on May 9, 2022. (Doc. No. 109.)

20-cv-01800-AJB-RBM

Defendants County of San Diego and Josue Gonzalez and CVWD responded in opposition. (Doc. Nos. 117, 115.) The County, CVWD, and Plaintiffs have also each filed several motions to exclude expert opinions and studies. (Doc. Nos. 103–07, 110.) This order follows.

## II.   MOTIONS TO EXCLUDE

### A.   Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to Rule 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258 JM (AJB), 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007).

Prior to admitting expert testimony, the trial court "must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). The trial court acts as a "gatekeeper" by making a preliminary determination of whether the expert's proposed testimony is not only relevant but reliable. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevance prong). *Daubert*, 509 U.S. at 592–93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

A district court has broad latitude in deciding how to measure reliability and in making the ultimate reliability determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). In essence, the court must determine whether the expert's work product amounts to "good science." *Daubert*, 509 U.S. at 593. In *Daubert*, the Supreme Court outlined factors relevant to the reliability prong, including (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. *Id.* at 593–94. As later confirmed in *Kumho Tire*, "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." 526 U.S. at 141–42.

Under the relevance or "fit" prong, the testimony must be "'relevant to the task at hand,' i.e., that it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995) (quoting *Daubert*, 509 U.S. at 597). Relevance requires opinions that would assist the trier of fact in reaching a conclusion necessary to the case. *See Kennedy*, 161 F.3d at 1230. In general, the *Daubert* analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's ultimate conclusions. *Daubert*, 509 U.S. at 595. However, the Supreme Court has cautioned that "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). As such, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

### B.   Discussion

#### 1.   Dr. David Fractor

CVWD moves to exclude the opinion testimony of Plaintiffs' expert economist, David Fractor, Ph. D, and his reports regarding future lost earnings of the two decedents in this case, Larissa Araujo and Andressa Dos Santos (collectively, "Decedents"). (Doc. No.

103.) CVWD asserts the opinions are inadmissible because they are not relevant under Federal Rule of Evidence 401(b), they lack foundation and are not based on reliable evidence or sufficient facts or data, and they violate the standard for admission of expert testimony under *Daubert*. (*Id.* at 2.)

### i.   Reliability

First, CVWD argues Dr. Fractor's opinions are unreliable under the first prong of the *Daubert* analysis because the assumptions he used in both Scenarios 1 and 2 of his Expert Report were given to him by counsel. (Doc. No. 103 at 10.) Having reviewed Dr. Fractor's report and deposition as well as the parties' arguments, the Court agrees with CVWD's assessment.

At the time of her passing, Ms. Araujo was 28 years old and had recently finished her university studies in International Relations at Faculdade ESAMC in Brazil. (Doc. No. 103-1 at 39.) According to Ms. Araujo's own writings of her future plans, she applied to the Au Pair exchange program in the United States to improve her English and continue her international relations studies. (*Id.*) She further wrote she "need[ed] to be fluent in English to get a job at an international company in my country [of Brazil]." (*Id.*)

Ms. Dos Santos was 26 years old when the instant collision occurred and had completed her undergraduate studies in Advertising and Marketing at Universidade Paulista – UNIP in Brazil. (*Id.* at 53.) Similarly, Ms. Dos Santos wrote in her APC2018 Application that she hoped to use the English she learned during the Au Pair exchange program to help her find a job "in my city" "[a]fter I return to my country [of Brazil] . . . ." (*Id.* at 55.) Both women were Au Pairs in the United States through a two-year exchange program at the time of their passing (*Id.* at 37.) Plaintiffs have not submitted any evidence that either Decedent paid anything to their respective heirs by way of financial support. (*See generally* Doc. No. 120.)

In his report, Dr. Fractor assumed Ms. Araujo intended on pursuing a career as an executive assistant in New York, commencing January 1, 2022. (*Id.* at 4.) Dr. Fractor ultimately opines that Ms. Araujo's parents experienced a loss of Ms. Araujo's future

earnings of $3,543,212. (*Id.*) Similarly, Dr. Fractor assumed Ms. Dos Santos intended on pursing a career as an advertising analyst in New York, where Ms. Dos Santos' parents ultimately experienced a loss of her future earnings of $3,260,797. (*Id.* at 5.) The Court can find no factual basis for these assumptions.

Dr. Fractor states his assumptions that Ms. Araujo intended to pursue a career as an executive assistant in New York was provided by counsel, and that he was not provided with any discovery from the case which indicated Ms. Araujo intended to pursue such a career in New York. (Doc. No. 103 at 7 (citing Deposition of David Fractor, Doc. No. 103-1, at 82).) Dr. Fractor further stated the assumptions regarding Ms. Dos Santos were "exactly the same as for Ms. Larissa [Araujo]." (*Id.*) Although Scenario 2 of Dr. Fractor's report were based on "United States averages without concern for the specific life events which [CVWD] challenges as speculative[,]" (Doc. No. 120 at 11), there is again no evidence that either Decedent intended on remaining in the United States after their positions as Au Pairs ended.

As such, without any underlying support for his conclusions, Dr. Fractor's report is "unsupported speculation" and must be excluded. *See Daubert*, 509 U.S. at 590.

### ii.    Relevance

Even if Dr. Fractor's opinions were found to be reliable, CVWD contends that in survival actions by the deceased plaintiff's estate, damages are prescribed by California Code of Civil Procedure § 377.34(a) and must be narrowly limited to "the loss or damage that the decedent sustained or incurred before death," which by definition excludes future damages. Plaintiffs respond this is true for survival actions, but that they have also filed a wrongful death action under California Code of Civil Procedure § 377.60, in which Plaintiffs' future financial benefits, lost due to Decedents' deaths, is a well-established aspect of damages. (Doc. No. 120 at 8.) CVWD responds that damages for wrongful death are measured by the financial benefit the heirs were receiving at the time of death, or those reasonably to be expected in the future. (Doc. No. 126 at 3.) Thus, asserts CVWD, Dr. Fractor's expert opinions are irrelevant because the statutory language excludes speculative

future lost earnings for employment positions the Decedents did not hold at the time of their death and that is not supported by evidence. (*Id.* at 2.)

A wrongful death claim is a state law statutory claim that compensates specified heirs of the decedent for losses suffered as a result of the decedent's death. *LAOSD Asbestos Cases*, 28 Cal. App. 5th 862, 872 (2018). "Under California Code of Civil Procedure [§] 377.61, damages for wrongful death are measured by the financial benefits the heirs were receiving at the time of death, those reasonably to be expected in the future, and the monetary equivalent of loss of comfort, society, and protection." *Boeken v. Philip Morris USA Inc.*, 217 Cal. App. 4th 992, 997 (2013) (internal citations and quotations omitted).

Here, the Court finds Dr. Fractor's opinions are irrelevant under the standard set forth in *Daubert*. Although a plaintiff may indeed recover damages for future financial benefits, they must be "reasonably . . . expected in the future." Cal. Code Civ. Proc. § 377.61. As discussed above, Dr. Fractor's report fails to have underlying factual support for his opinions regarding the future financial earnings of Ms. Araujo and Ms. Dos Santos. As such, the damages calculated by Dr. Fractor are not reasonably expected in the future, nor were they measured by the financial benefits that Plaintiffs (the parents of the Decedents) were receiving at the time of Decedents' deaths. *See Griffey v. Pacific Elec. Ry. Co.*, 58 Cal. App. 509, 517 (1922). In fact, Plaintiffs fail to offer any factual evidence that Plaintiffs would have received any financial support, gifts, or benefits from their children, had they survived. Accordingly, the Court **GRANTS** CVWD's motion to exclude Mr. Fractor's testimony.

### 2.    Dr. Ilene Zackowitz

The County next moves to exclude specified opinions of Plaintiffs' human factors expert, Dr. Ilene Zackowitz, Ph. D., as follows:

1.    That, prior to the instant collision, the County should have installed stop signs or other "positive guidance" or signage at the approaching intersection; and

2.    That the County, prior to the collision, failed to perform traffic studies

concerning the intersection.

(Doc. No. 104.) The County asserts its motion is on the grounds that Dr. Zackowitz lacks scientific, technical, or other specialized knowledge regarding these matters, has failed to base such opinions on sufficient facts or data, and failed to reliably apply relevant principles to the facts of this case. (*Id.* at 2.) Plaintiffs respond that the County's motion should be denied because this is not a proper basis for exclusion, but rather a basis for cross-examination. (Doc. No. 119 at 6–7.)

Regarding Dr. Zackowitz's opinion that the County should have installed positive guidance regarding the approaching intersection, Plaintiffs argue Dr. Zackowitz is qualified to testify about human factors, such as the requirement of positive guidance in order for motorists to anticipate forthcoming hazards. (*Id.* at 8–9.) Plaintiffs maintain Dr. Zackowitz is a member of the Human Factors and Ergonomics Society ("HFES"), the Forensics Professional Group of HFES, of which she was the chairperson from 2016 to 2018, and the Safety and Technical Group of HFES. (*Id.* at 7.) Further, Dr. Zackowitz has been employed as a senior human factors and safety consultant since at least 1998. (*Id.*) Moreover, Plaintiffs concede Dr. Zackowitz is not a traffic engineer, nor has performed any traffic engineering analysis to inform her opinions. (*Id.* at 11.) Rather, Plaintiffs argue Dr. Zackowitz is testifying as to the impact of traffic signage on humans and how it informs drivers and impacts their decision-making, rather than basing her opinions on traffic engineering. (*Id.*)

Plaintiffs offer Dr. Zackowitz's opinion as to whether the subject intersection provided adequate positive guidance to Mr. Andre Dos Santos De-Sa ("De-Sa") to indicate the presence of the intersection or the approaching van. Moreover, her opinions are based on her experience, training, education, and review of materials relevant to the accident. The Court finds Dr. Zackowitz's testimony regarding positive guidance will assist the jury. As such, the Court **DENIES** the County's motion on this basis.

Next, the County moves to exclude Dr. Zackowitz's opinion that the "incident was foreseeable due to the poor management of the hazard: failure to perform a traffic study . .

9

. .” (Doc. No. 104-1 at 5 (citing Doc. No. 104-2 at 22).) Again, Dr. Zackowitz and Plaintiffs concede that the question of whether a traffic study at an intersection is warranted by a public agency is outside of Dr. Zackowitz's expertise. (Doc. No. 119 at 12.) Plaintiffs maintain she does not intend to testify in this regard at trial. (*Id.*) Thus, the Court **GRANTS** the County's motion to exclude Dr. Zackowitz's opinion that a traffic study was warranted by a public agency for the subject intersection.

### 3.    David Casteel and Robert Thompson

The County also moves to exclude specified opinions of Cross-Defendant De-Sa's accident reconstruction and human factors experts, David Casteel and Robert Thompson. (Doc. No. 105.) Specifically, the County seeks exclusion of Casteel and Thompson's collaborative opinion regarding sightline and visibility obstruction from each respective driver's position, as they allegedly failed to consider the actual eye height of either driver in evaluating the extent of any berm-related sight obstruction. (Doc. No. 105-1 at 2.)

Mr. Casteel, who has decades of experience with reconstructing complex motor vehicle accidents, was retained by De-Sa to perform an accident reconstruction of the subject collision. (Doc. No. 116 at 3.) To prepare their opinions, Casteel Reconstruction conducted a site inspection of the subject intersection, performed a FARO scan of the area during the inspection, conducted an inspection of the Ford van involved in the collision, analyzed the crash data for the Ford van and Hyundai Elantra, and reviewed and relied upon the relevant police reports and depositions. (*Id.*) The County does not challenge the qualifications of Mr. Casteel or Mr. Thompson as experts in their fields. (Doc. No. 133 at 1.)

In conducting their collaborative expert report opinions, neither Casteel nor Thompson considered the actual eye height of either driver in evaluating the extent of any berm-related sight obstruction. (Doc. No. 105-1 at 2.) Rather, they either referenced what Casteel could personally see during his personal inspection while standing on one of the intersecting roadways, outside of a vehicle, or relied on a default eye height setting in a computer program used for their simulation. (*Id.*) For the two drivers' view simulations,

Casteel and Thompson used the PC-Crash program, which placed the camera in the middle of the headrest. (Doc. No. 116 at 4.) Because the exact eye height of each driver could not be determined, Casteel Reconstruction used approximate eye heights for each driver, as did all other accident reconstruction experts in this case. (*Id.* at 7–8.) Mr. Casteel further testified that regarding Mr. Gonzalez's approximate eye height, he "used a standing height of five-foot-eight with the person at or near 150 pounds and looked at the approximate height that that would result in a person seated in a van for establishing the – the line-of-sight portion of the simulation." (*Id.* at 8 (citing Deposition of David Casteel ("Casteel Depo."), Doc. No. 116-1, at 73).) In simulating Mr. De-Sa's approximate eye height, Mr. Casteel testified he "used 3.5 [feet] for a passenger vehicle of that size, of the Hyundai Elantra. To determine the approximate eye height, it's going to be . . . within a range. The 3.5 is going to be very close." (*Id.* (citing Casteel Depo at 74).)

Although the reconstruction evidence may be imperfect, the evidence meets the threshold for admissibility, which does not require identical conditions. The County will have an opportunity to challenge the evidence through aggressive cross-examination, and the jury can decide how much weight to give it. Accordingly, the County's motion as to Mr. Casteel and Mr. Thompson is **DENIED**.

### 4.   Edward Ruzak

Next, the County moves to exclude specified opinions of CVWD's retained traffic engineering expert, Edward Ruzak, as follows:

1.   That every intersection in the County should be stop controlled by default; and

2.   That the intersection of Schrimpf Road and English Road was in a dangerous condition on October 2, 2019, because it was not stop controlled.

(Doc. No. 106.)

Regarding Mr. Ruzak's first contested opinion, the County contends Mr. Ruzak failed to conduct a professional analysis in determining whether the County should have installed stop signs at every County intersection, but rather used his own subjective

standard. (Doc. No. 106-1 at 2.) To this point, the County asserts that "Mr. Ruzak concedes that his opinion is exactly the opposite of the standard set by the Manual on Uniform Traffic Control Devices [("MUTCD")][,]" which the County asserts is the applicable professional standard. (*Id.* at 4.) The MUTCD "is published by the State of California, Caltrans and is issued to adopt uniform standards and specifications for all official traffic control devices in California, in accordance with Section 21400 of the California Vehicle Code[.]" (Doc. No. 106-2 at 27.)

CVWD first clarifies that Mr. Ruzak never opined that *every* intersection in the County should be stop controlled by default. (Doc. No. 114 at 4.) Rather, Mr. Ruzak stated that although he *personally* believed every intersection should be stop controlled, "I don't think I can say yes [that every one of these intersections is incorrectly engineered] . . . but I think that there's a definite necessity for these tully [sic] counties to basically look at some of these locations and determine whether they need to put some positive guidance there, i.e. stop controls." (*Id.* at 4–5 (citing Deposition of Edward Ruzak ("Ruzak Depo."), Doc. No. 114-2, at 5–6).) CVWD additionally counters that Mr. Ruzak's opinions are admissible because they were based on his specialized knowledge and skill and are helpful to the trier of fact. (Doc. No. 114 at 10.) CVWD further asserts Mr. Ruzak's opinions were based on sufficient data and facts, as he relied on both AASHTO standards and the AASHTO Policy on Geometric Design of Highways and Streets (the "Green Book").

Upon reviewing Mr. Ruzak's expert report and deposition, the Court finds Mr. Ruzak did not rely upon an objective source to show he followed the scientific method practiced by a recognized minority of scientists in his field. Rather, Mr. Ruzak admitted his opinion deviated from the standard set out in the MUTCD, and rather than relying upon AASHTO standards or the Green Book, Mr. Ruzak merely states that every intersection in the County should be stop controlled by default "unless the agency did a study, even a simple, informal study, and use guidelines such as AASHTO to determine if there are sight lines available for all directions and no problems." (Ruzak Depo. at 6–7.) However, neither Mr. Ruzak nor CVWD indicate that Mr. Ruzak's recommendation of conducting a study

to determine the necessity for signage for each intersection in the County is generally accepted in the relevant scientific community. While Mr. Ruzak may have the experience and knowledge to show more than mere speculation, he failed to do so. "[E]ven a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) (internal quotation marks omitted). Thus, the Court **GRANTS** the County's motion to exclude Mr. Ruzak's opinion that every intersection in the County should be stop controlled by default.

The Court next turns to Mr. Ruzak's second opinion that the County should have installed stop controls at the intersection of Schrimpf Road and English Road prior to October 2, 2019. The County asserts Mr. Ruzak reached this conclusion by applying his own "default rule" that every intersection should be stop controlled, as discussed above. (Doc. No. 106-1 at 4.) The County argues the MUTCD is the applicable standard for the subject intersection, which provides three factors that traffic engineers must consider in determining whether or not to install stop controls at a given intersection. (*Id.* at 8.) These factors are: (1) whether traffic volume at the intersection exceeds 6,000 vehicles per day; (2) whether a restricted view exists that requires road users to stop in order to adequately observe conflicting traffic; and (3) whether 3 or more crashes occurred at the subject intersection in a 12-month period which could have been corrected by the installation of stop controls. (*Id.* (citing Doc. No. 106-2 at 29).)

Mr. Ruzak acknowledges that stop controls were not required at the subject intersection under the standards set forth in the MUTCD. (*Id.* at 8–9.) However, without analyzing the subject intersection, Mr. Ruzak opines that stop controls were warranted there. Mr. Ruzak has never been to the subject intersection, has not conducted measurements of the physical dimensions of the intersection, and has not relied on anyone else's measurements of the intersection. (*Id.* at 9.) Based on the foregoing, the Court finds Mr. Ruzak's testimony is not the product of reliable principles and methods, and has not reliably applied any reliable principles and methods to the facts of the case. Mr. Ruzak's

13

conclusion that the County should have installed stop controls at the intersection of Schrimpf Road and English Road appears to be based on speculation and conjecture, rather than sufficient facts and data. The Court thus **GRANTS** the County's motion to exclude Mr. Ruzak's opinion that the intersection of Schrimpf Road and English Road was in a dangerous condition on October 2, 2019, because it was not stop controlled.

### 5.    Reza Marshal

The County moves to exclude specified opinions of Plaintiffs' retained traffic engineering expert, Reza Marshal. Specifically, the County seeks to exclude the following opinions:

1.    That the County of Imperial had notice that the berm north of Schrimpf Road existed and constituted a dangerous condition prior to October 2, 2019; and

2.    That the berm created a dangerous condition on Schrimpf and English Roads by limiting the intersection sight distance to a distance shorter than that prescribed by the AASHTO Green Book.

(Doc. No. 107 at 2.)

The County argues that stating it had notice of the berm prior to October 2, 2019 is speculative and "pure conjecture," as Mr. Marshal admitted he was not provided information in this case to indicate that any County employee was ever aware of the berm or ever observed anything unsafe at the subject intersection. (Doc. No. 107-1 at 5–7.) The County further points to Mr. Marshal's testimony that County employees would have noticed the berm while they performed "blading" maintenance on the subject unpaved roads, though Mr. Marshal admitted he is unfamiliar with how blading operations work, what type of equipment is used for blading, how high the blading equipment operators sit above the surface of the roadway, or what the blading operators are trained to look at while operating blading equipment. (*Id.* at 6–7.) Plaintiffs respond, and the Court agrees, that Mr. Marshal's notice opinion may be based on constructive notice as opposed to actual notice, and that Mr. Marshal has cited to evidence of constructive notice to support his opinion. (Doc. No. 118 at 9–10.) Plaintiffs assert this opinion is based on Mr. Marshal's review of

testimony and his own personal observation during his visit of the subject intersection. (*Id.*)

Although the County asserts Mr. Marshal did not timely disclose opinions bearing on constructive notice, (Doc. No. 132 at 4), the Court finds this argument without merit. Mr. Marshal's expert report does not specify whether his opinion was specific to actual or constructive notice. (*See* Doc. No. 107-2 at 24.) Rather, Mr. Marshal merely states it is his opinion "that the County of Imperial had notice of the dangerous condition prior to the subject collision." (*Id.*) As such, Mr. Marshal may testify as to this specific opinion. As Plaintiffs have correctly argued, the County is welcome to address any alleged analytical deficiencies in Mr. Marshal's testimony through cross-examination, its presentation of evidence, and through the opinions of its own expert.

The County argues further that Mr. Marshal's second disputed opinion on the need for traffic control devices, which is based on the AASHTO Green Book standards, should be precluded because the standards applicable to the subject intersection is provided in the AASHTO Guidelines for Geometric Design of Low-Volume Roads. (Doc. No. 107-1 at 8–9.) Experts may demonstrate the scientific validity of a theory or technique by showing that "the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Daubert II*, 43 F.3d at 1318. Testifying experts may alternatively show the validity of their theory by explaining "precisely how [the experts] went about reaching their conclusions and point[ing] to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605–06 (9th Cir. 2002) (quoting *Daubert II*, 43 F.3d at 1319) (alterations in original).

Here, Mr. Marshal's opinions are based on the AASHTO Green Book standards, which is relied upon by the California Department of Transportation for many standards. (Doc. No. 118 at 14; *see also* Declaration of Reza Marshal ("Marshal Decl."), Doc. No. 81-7, ¶ 7(a)(iv).) The Court finds Mr. Marshal relies upon an objective source to show he

has followed the scientific method practiced by a recognized minority of scientists in his field. Additionally, the County does not offer any expert testimony in support of their motion to exclude Mr. Marshal's testimony. (*See generally* Doc. No. 107.) Moreover, as asserted by Plaintiffs, the County's own traffic engineer, Mr. Rock Miller, testified at his deposition that the Green Book—the same guidelines used by Mr. Marshal—would have been applicable at the time of the incident. (Doc. No. 118 at 16; *see also* Deposition of Rock Miller, Doc. No. 118-8, at 3–4.) For these reasons, the Court **DENIES** the County's motion to exclude Mr. Marshal's testimony.

### 6.    The Kimley-Horn Study

Next, Plaintiffs move to exclude any reference to the County's submitted Kimley-Horn speed study on the basis that it suffers from several flaws that renders the study inadmissible under Rule 702 and *Daubert*. (Doc. No. 110-1 at 5.) Specifically, Plaintiffs contend the study did not collect enough data and was conducted after the roadway signage had been changed subsequent to the collision at issue, rendering the study invalid. (*Id.* at 2.) Specifically, the Kimley-Horn study only measured vehicles north- and south-bound for two hours in two locations, obtaining data for only 9 vehicles' speeds at the first location and 22 vehicles' speeds at the second location. (*Id.* at 3.) Also, the Kimley-Horn study did not determine the statistical significance of the sample it measured. (*Id.*) However, "[c]ourts regularly find that concerns that a survey's sample size is too small or unrepresentative do not preclude its admission, but go to the weight to be accorded the survey results." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 951 (C.D. Cal. 2015) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997)).

Plaintiffs also assert they challenge the accuracy and reliability of the Kimley-Horn speed study in its entirety. (Doc. No. 125 at 5.) Plaintiffs rely upon Mr. Reza Marshal's testimony that the Kimley-Horn survey data was not valid. (*Id.*) However, Plaintiffs' basis—and Mr. Marshal's—for challenging the study's accuracy is its sample size. For example, Mr. Marshal testified, "I don't believe the speed survey that they conducted is valid. . . . [b]ecause the number of vehicles that speed survey is supposed to take a survey

of in order to conduct a valid study would have to be a minimum of 100 and in no case less than 50." (Plaintiffs' Deposition of Reza Marshal, Doc. No. 110-4, at 4.) Accordingly, the Court **DENIES** Plaintiffs' motion on this basis.

Next, the County asserts the Kimley-Horn study was one of two traffic analyses commissioned by the County in late 2019, after two collisions occurred at the intersection of Schrimpf and English Roads in the span of a few weeks—including the instant collision. (Doc. No. 121 at 2.)[1] As a result of staff analysis, the Department of Public Works installed two-way stop signs at four intersections along the English corridor, including the subject intersection. (*Id.* at 2–3.) The County asserts the Kimley-Horn analysis served in tandem with the staff analysis, "providing a more in-depth assessment of the English Road corridor, its collision history, and the ways in which vehicles typically travel through it." (*Id.* at 3.) The County asserts that because the two corridor studies are part-and-parcel of a subsequent remedial measure, all evidence of the corridor studies should be precluded. (*Id.*) However, the County appears to move to exclude unidentified evidence in its opposition to Plaintiffs' motion, and the Court lacks sufficient information at this juncture to rule on the County's request. As such, the Court defers ruling on the County's request until motions in limine are later filed.

## III. MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Legal Standard

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a

---

[1] The County requests judicial notice of Imperial County Board of Supervisors Resolution No. 2019-203. (Doc. No. 121-2 at 1.) Federal Rule of Evidence 201 states a court may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Because the Court does not rely on these documents in deciding this motion, the County's request for judicial notice is **DENIED AS MOOT**.

court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the nonmoving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the nonmoving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the nonmoving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks, alterations, and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See*

18

*Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1159 (C.D. Cal. 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Further, a motion for summary judgment may not be defeated by evidence that is "merely colorable, or is not significantly probative . . . ." *See Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006) (same). If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment. *See Nissan Fire & Marine*, 210 F.3d at 1103.

### B. Discussion

Plaintiffs move for partial summary judgment as follows:

1.     Against CVWD on the claim that it was vicariously liable for Defendant Gonzalez's negligence as Gonzalez was in the course and scope of his employment with CVWD at the time of the collision;

2.     Against CVWD and Gonzalez on the claim they were negligent and their negligence was a legal/proximate cause of Plaintiffs' deaths and damages;

3.     Against CVWD, Gonzalez, County of Imperial, Cross-Defendant Andre Dos-Santos De-Sa, and Third-Party Defendant IID on the claim that Plaintiffs were not comparatively negligent and at fault for their injuries;

4.     Against CVWD, Gonzalez, County, and IID on the claim that De-Sa was not comparatively negligent and at fault for Plaintiffs' injuries;

5.     Against County on the claim that County owned and maintained the subject intersection;

6.     Against County and IID on the claim that the intersection was in a dangerous condition; and

7.     Against County on the claim that County had sufficient notice of the dangerous condition prior to the instant collision to reasonably remedy the dangerous condition.

(Doc. No. 109 at 2–3.)

### 1.    Vicarious Liability Claim Against CVWD

Under the doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by an employee within the scope of employment. *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 208 (1991).

Without conceding negligence, CVWD does not dispute that its employee, Defendant Josue Gonzalez, was within the course and scope of his employment at the time of the instant accident. (Doc. No. 115 at 4.) Thus, the Court **GRANTS** Plaintiffs' motion for partial summary judgment that CVWD is vicariously liable for Gonzalez's alleged negligence if said negligence is proven at trial.

### 2.    Negligence Claim Against CVWD & Gonzalez

Plaintiffs next move for partial summary judgment on their claim that Defendants CVWD and Gonzalez were negligent, under the theory of negligence per se, in violating California Vehicle Code § 22349(a) by driving in excess of the speed limit. (Doc. No. 109-1 at 14.) Gonzalez and CVWD respond that there is a disputed question of fact as to whether Vehicle Code § 22349 applies here due to lack of signage, and if so, whether such was the proximate cause of the accident. (Doc. No. 115 at 9.) CVWD and Gonzalez further contend there are multiple questions of fact regarding the cause or causes of the accident, including lack of traffic controls, lack of signage, obstructed sight lines, and the presence of the berm. (*Id.* at 10.)

#### i.    Whether California Vehicle Code § 22349 Applies

"Evidence Code section 669 codifies the common law doctrine of negligence per se, under which statutes and regulations may be used to establish duties and standards of care in negligence actions . . . ." *Millard v. Biosources, Inc.*, 156 Cal. App. 4th 1338, 1350 (2007); *see Elsner v. Uveges*, 34 Cal. 4th 915, 927 n.8 (2004) ("Statutes may be borrowed in the negligence context for one of two purposes: (1) to establish a duty of care, or (2) to establish a standard of care.") The doctrine is not a separate cause of action. *Millard*, 156 Cal. App. 4th at 1353 n.2.

Negligence per se is a theory of negligence that raises a presumption of negligence. *Ramirez v. Plough, Inc.*, 6 Cal. 4th 539, 547 (1993). "[N]egligence per se is not a separate cause of action, but creates an evidentiary presumption that affects the standard of care in a cause of action for negligence." *Johnson v. Honeywell Int'l, Inc.*, 179 Cal. App. 4th 549, 555 (2009) (internal quotation marks omitted). To plead a cause of action for negligence per se, the plaintiff must allege: (1) defendant violated a statute, ordinance or regulation; (2) the violation proximately caused death or injury to plaintiff; (3) such death or injury was of the kind that the statute, ordinance or regulation was designed to prevent; and (4) the plaintiff belonged to the class of persons for whose protection the statute, ordinance or regulation was adopted. *See* Cal. Evid. Code § 669(a); *Iversen v. Cal. Vill. Homeowners Assn.*, 194 Cal. App. 4th 107, 114 (2011).

Here, Plaintiffs rely on Vehicle Code § 22349(b) to establish negligence per se, which states: "Notwithstanding any other provision of law, no person may drive a vehicle upon a two-lane, undivided highway at a speed greater than 55 miles per hour unless that highway, or portion thereof, has been posted for a higher speed by the Department of Transportation or appropriate local agency . . . ." It is undisputed that Gonzalez violated § 22349(b) at the time of the instant accident, wherein Gonzalez's vehicle "increased from 59 miles an hour to 60.9 miles an hour" in the 5 seconds prior to the collision. (Doc. No. 109-1 at 16; *see generally* Doc. No. 115.)

CVWD and Gonzalez assert it is a disputed question of fact whether § 22349 applies here due to the lack of signage at the intersection of English Road and Schrimpf Road. (Doc. No. 115 at 9.) Specifically, CVWD and Gonzalez argue negligence per se does not apply because the California State Legislature "clearly set forth its intent that there be adequate warnings and signage that gives guidance to drivers so that when such warnings are ignored, a violation of the default speed limit occurs." (*Id.* at 10.) In support, CVWD and Gonzalez point to subdivision (c), which states, "[i]t is the intent of the Legislature that there be reasonable signing on affected two-lane, undivided highways described in subdivision (b) in continuing the 55 miles-per-hour speed limit, including placing signs at

county boundaries to the extent possible, and at other appropriate locations." Cal. Veh. Code § 22349(c). However, "the existence of reasonable signing [is] not an element of the speeding infraction under Vehicle Code section 22349, subdivision (b)." *People v. Rebosio*, E074494, 2022 WL 702914, at *10 (Cal. Ct. App. Mar. 9, 2022); *see Kamal v. Farber*, B269077, 2016 WL 5929917, at *4 (Cal. Ct. App. Oct. 12, 2016) (finding § 22349(c) "is an empowering statute, and the manner in which that power is exercised is a matter for discretionary decisions" and does "not mandatorily command [public works employees] to erect signs at any particular locations"); *see also Cnty of Los Angeles v. Superior Court*, 102 Cal. App. 4th 627, 639 (2002) ("An enactment does not create a mandatory duty if it merely recites legislative goals and policies that must be implemented through a public agency's exercise of discretion.").

As such, Vehicle Code § 22349 applies here. Thus, because Gonzalez violated Vehicle Code § 22349(b), the Court **GRANTS** Plaintiffs' partial motion for summary judgment as to the first element of their negligence per se claim, that Gonzalez and CVWD violated a statute, ordinance, or regulation of a public entity.

## ii.   Whether Gonzalez & CVWD's Negligence Was the Proximate Cause of Plaintiffs' Deaths and Injuries

Next, Plaintiffs assert it is undisputed that Gonzalez's driving in excess of the speed limit was a legal cause of the collision and Plaintiffs' deaths and damages. (Doc. No. 109-1 at 17.) CVWD and Gonzalez disagree, asserting California Evidence Code § 669(a) requires proof that the violation proximately caused death or injury to the person or property, and that this proof requirement is an issue of fact. (Doc. No. 115 at 9.) The Court agrees.

"In order for a claim of negligence per se to succeed, all four elements must be shown. The first two are matters for the trier of fact; the second two are to be determined by the court as a matter of law." *Lua v. S. Pac. Transp. Co.*, 6 Cal. App. 4th 1897, 1901–02 (1992) (citing *Capolungo v. Bondi*, 179 Cal. App. 3d 346, 350 (1986)). Because there are genuine disputes of material fact, the Court **DENIES** Plaintiffs' motion for summary

judgment as to whether CVWD and Gonzalez's negligence was a legal/proximate cause of Plaintiffs' deaths and damages.

### iii.  Whether Decedent Plaintiffs Were Comparatively Negligent

Plaintiffs' further request the Court to grant summary judgment against CVWD, Gonzalez, County of Imperial, Cross-Defendant De-Sa, and Third-Party Defendant IID on the claim that Decedent Plaintiffs were not comparatively negligent and at fault for their injuries. (Doc. No. 109-1 at 22–25.) The County does not dispute this claim in its opposition. (*See generally* Doc. No. 117.) CVWD and Gonzalez oppose this request, asserting that issues of negligence are for the triers of fact, and that courts rarely decide comparative negligence questions without submitting them to the jury. (Doc. No. 115 at 10–11 (citing *Maxwell v. Colburn*, 105 Cal. App. 3d 180, 186 (1980)).) However, CVWD and Gonzalez offer no evidence demonstrating that a genuine dispute as to any material fact exists as to the comparative negligence of Decedent Plaintiffs. As such, the Court **GRANTS** Plaintiffs' motion for partial summary judgment against CVWD, Gonzalez, County of Imperial, Cross-Defendant De-Sa, and Third-Party Defendant IID on the claim that Decedent Plaintiffs were not comparatively negligent and at fault for their injuries.

### iv.  Whether Cross-Defendant De-Sa Was Comparatively Negligent

Plaintiffs next move for partial summary judgment on the claim that Cross-Defendant De-Sa was comparatively negligent. (Doc. No. 109-1 at 26–28.) Both the County and CVWD and Gonzalez oppose summary judgment on this issue. (Doc. Nos. 115 at 10–14, 117 at 19–20.)

CVWD and Gonzalez assert the jury is entitled to hear all the evidence regarding the circumstances of both drivers as they drove on the two-lane dirt roads approaching the intersection where the accident occurred. (Doc. No. 115 at 13.) Specifically, CVWD and Gonzalez argue there are issues of material fact, including the reasonableness of De-Sa in avoiding CalTrans road closures and detours and instead electing to proceed on unknown, uncontrolled dirt roads, and De-Sa's approach of the intersection exceeding 55 m.p.h. (*Id.*)

The County similarly contends there are issues of material fact, such as De-Sa's ability to see Gonzalez's Ford at all times during his approach to the intersection, notwithstanding the presence of the berm. (Doc. No. 117 at 20.) In support of this assertion, the County references the Deposition of Jon Landerville, MSME, PE, who stated that at four seconds prior to the collision, De-Sa could have seen a portion of Gonzalez's Ford if he had looked in the direction of the Ford. (Deposition of Jon Landerville, Doc. No. 117-1, at 253–54.) This assertion is further supported by Expert Thomas F. Fugger, Jr., P.E., (Deposition of Thomas F. Fugger, Jr., Doc. No. 117-1, at 238–39), and Expert Gavin Huntley-Fenner, Ph.D, (Doc. No. 117-1 at 303–04).

The County further argues that because this is a diversity case, California principles of comparative fault govern. (*Id.* at 19.) Specifically, the County points to Civil Code § 1431.2(a) which provides:

> In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages *shall be several only and shall not be joint*. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount.

(*Id.* (citing Cal. Civ. Code § 1431.2(a)).)   As such, the County asserts, a jury should determine whether, and to what extent, each party is responsible for a comparative share of the liability for the subject accident. (*Id.*)

As briefly mentioned above in Section III.B.3, "courts rarely decide comparative negligence questions without submitting them to the jury." *Maxwell*, 105 Cal. App. 3d at 186. Moreover, "[w]here a case is subject to comparative fault principles, it is inappropriate for summary judgment." *Wright v. Stang Mfg. Co.*, 54 Cal. App. 4th 1218, 1233 (1997) (citing *Milwaukee Elec. Tool Corp. v. Superior Court*, 15 Cal. App. 4th 547, 565 (1993)); *see Knight v. Jewett*, 3 Cal. 4th 296, 313–14 (1992) (stating "the 'comparative fault' doctrine is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibilities of various parties for an injury . . . in order to

arrive at an 'equitable apportionment or allocation of loss'").

In light of the disputed facts concerning this collision, summary judgment based on comparative negligence as to De-Sa is not appropriate. Therefore, Plaintiffs' motion for partial summary judgment against CVWD, Gonzalez, County, and IID on the claim that De-Sa was not comparatively negligent and at fault for Plaintiffs' injuries is **DENIED**.

### 3.   Wrongful Death Claim Against the County

#### i.   Whether the County Owned and Maintained the Subject Intersection

The County does not dispute that it owns and controls both Schrimpf and English Roads, at the location where the two roads intersect. (Doc. No. 117 at 8; *see also* Doc. Nos. 5 at 7, 28 at 8.) However, the County clarifies that it does not own or control the dirt berm which lies 73 feet north of Schrimpf Road. (Doc. No. 117 at 8.) Because the County does not dispute that it owns and maintains the subject intersection, the Court **GRANTS** partial summary judgment as to this fact.

#### ii.   Whether the Intersection Was in a Dangerous Condition

Plaintiffs also move for partial summary judgment as to the first element of their wrongful death claim based on a "dangerous condition" theory. (Doc. No. 109-1 at 28.) Specifically, Plaintiffs allege the uncontrolled intersection in which the two vehicles collided was maintained by the County and in a dangerous condition. (*Id.*) The County opposes, asserting that an issue of material fact exists because the berm did not completely block either driver from seeing the other. (Doc. No. 117 at 10.) It is undisputed the alleged dangerous condition was designed and constructed by IID, rather than the County. (*Id.* at 8.)

A public entity is liable under California Government Code § 835 if the plaintiff establishes: (1) the public property was in a dangerous condition at the time of the injury; (2) the injury was proximately caused by the dangerous condition; (3) the kind of injury that occurred was reasonably foreseeable as a consequence of the dangerous condition; and *either* (4)(a) the dangerous condition was created by a public employee's negligent or

wrongful act within the scope of their employment, *or* (b) the entity had actual or constructive notice of the dangerous condition under § 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition. Cal. Gov't Code § 835.

A "dangerous condition" is defined as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." Cal. Gov't Code § 830(a). "Whether a condition creates a substantial risk of harm depends on how the general public would use the property exercising due care" and is determined under an objective standard. *Schonfeldt v. State*, 61 Cal. App. 4th 1462, 1466 (1998). The California Supreme Court has held that "[t]he existence of a dangerous condition is ordinarily a question of fact . . . but it can be decided as a matter of law if reasonable minds can come to only one conclusion." *Bonanno v. Cent. Contra Costa Transit Auth.*, 30 Cal. 4th 139, 148 (2003).

Plaintiffs first rely upon the sightline analysis performed by Plaintiffs' retained civil engineer, Mr. Marshal. (Doc. No. 109-1 at 28.) Based on the sightline analysis, Mr. Marshal determined that, due to the dirt berm, the sightlines for both drivers were obstructed such that the drivers could not adequately see one another. (*Id.*) Mr. Marshal further states that although the intersection was unobstructed by the berm for the final 150 feet before the drivers entered the intersection, the subject intersection requires a sight distance of 285 feet for a speed limit of 55 mph, as was the speed limit here. (*Id.* at 29.) Plaintiffs provide further testimony from experts which show that at 55 mph, a driver travels 150 feet in 1.8 seconds. (*Id.* at 30.) Thus, with only 150 feet of sight distance after the berm, the drivers would have had roughly 1.8 seconds to perceive, react, and implement an evasive maneuver to cross-traffic. (*Id.*) Plaintiffs' human factors expert, Dr. Zackowitz, additionally testified that the drivers lacked sufficient time to react to each other after they could first see one another because perception response time is generally within 1.6 seconds, but can be longer. (*Id.* at 31.) Thus, the drivers would have had a mere 0.2 seconds

to effectuate a response to avoid the hazard of oncoming traffic. (*Id.*)

The County opposes, asserting the berm caused—at most—only a partial obstruction of the drivers' lines of sight, and thus the intersection was not in a dangerous condition. (Doc. No. 117 at 10.) Rather, the County argues, Gonzalez and De-Sa could have seen one another despite the partial sightline obstruction from the berm. (*Id.*) The County contends this is supported by Cieran Perry's statement to law enforcement immediately after the accident that he actually saw De-Sa's Hyundai and its dust trail prior to the accident. (*Id.* (citing Deposition of Officer Michael Chell, Doc. No. 117-1, at 152–53).) This is further supported by Plaintiffs' accident reconstruction expert, Mr. Jon Landerville, who testified that at four seconds prior to the collision, De-Sa and Gonzalez could have seen a portion of the other's car if they had looked in that direction. (*Id.* (citing Deposition of Jon Landerville, Doc. No. 117-1, at 253–54); *see also* Doc. No. 117-1 at 238–39 (Deposition of Thomas Fugger, testifying that in the five seconds of approach to the intersection, the windowsill height above the berm was visible for each vehicle); Doc. No. 117-1 at 273 (Mr. Miller's export report, asserting that based upon the California Highway Patrol MAIT report, the two vehicles would have been fully visible to each other when each was 100 feet from the intersection).)[2]

Based on the foregoing, the Court concludes there are triable issues of fact concerning whether the intersection was in a dangerous condition. Because there are material facts in dispute, summary judgment is inappropriate as to whether a dangerous condition existed at the time of the collision. On this basis, Plaintiffs' motion for partial summary judgment is **DENIED**.

///

///

---

[2] Plaintiffs also argue that a post-accident installation of stop signs at the subject intersection constitutes evidence that the intersection was in a dangerous condition at the time of the accident, due to the lack of stop signs. (Doc. No. 109-1 at 31.) However, evidence of a subsequent remedial measure is inadmissible to prove the existence of a dangerous condition. *See* Cal. Gov't Code § 830.5(b).

### 4.    Notice

California Government Code § 835(b) provides a plaintiff may establish that a public entity had either actual or constructive notice of a dangerous condition under § 835.2 "a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." *Cole v. Town of Los Gatos*, 205 Cal. App. 4th 749, 778 (2012) (citing Gov't Code § 835(b)).

The County asserts it lacked actual knowledge that the subject berm existed and would have had no reason to investigate the area or believe that the intersection was unsafe in any way. (Doc. No. 117 at 15.) Plaintiffs assert they are not required to have direct evidence of notice, and instead may rely on circumstantial evidence. (Doc. No. 128 at 11.) Because "[c]onstructive knowledge may be shown by circumstantial evidence" and Plaintiffs fail to address actual notice in their reply, the Court finds Plaintiffs concede this point to the County.

California Government Code § 835.2 provides that constructive notice exists "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." Cal. Gov't Code § 835.2(b); *Heskel v. City of San Diego*, 227 Cal. App. 4th 313, 317 (2014) ("Whether the dangerous condition was obvious and whether it existed for a sufficient period of time are threshold elements to establish a claim of constructive notice."). Whether a public entity had constructive notice is generally a question of fact for the jury to decide. *Gallipo v. City of Long Beach*, 146 Cal. App. 2d 520, 527 (1957). Here, it is undisputed that the berm was built in 2014, approximately five years before the subject collision.

Plaintiffs first argue the County had a system to regularly inspect roads for dangerous conditions, so the County had constructive notice of the berm's existence. (Doc. No. 109-1 at 32.) In support, Plaintiffs refer to the testimony of the County's employee, John Gay, in which he stated "it's a matter of everyday when our crews are out, you know, particularly our managers. . . . if they were to see something within their immediate areas

of operation, then they're going to, you know, they're going to note that in some manner that's going to be put into a report or two to fix." (Deposition of John Gay ("Gay Depo."), Doc. No. 109-17, at 5.) Mr. Gay further testified the County attempts to blade dirt roads one to three times a year, and that "if [the blade operators] see something in the road that needs to be addressed, the expectation is that they would either address it then, or if it were more extensive, address it later." (*Id.* at 9.) Plaintiffs further rely on the testimony of Mr. Marshal, who stated "that anybody, you know, who has been out there, they would have noticed the berm." (Doc. No. 109-16 at 3.)

The County responds that Plaintiffs have not met their burden on summary judgment that the County had constructive notice of the alleged dangerous condition because Plaintiffs materially misrepresent the evidence regarding notice of the existence of the berm. (Doc. No. 117 at 15.) First, the County asserts field operations and assistant road yard supervisors are primarily responsible for proactively reviewing road conditions for potential hazards or defects, rather than blading operators. (*Id.* at 15–16 (citing Gay Depo. at 5).) The County further asserts that Mr. Gay never testified that a County blading operator would be expected to identify a line-of-sight obstruction from a berm seventy-three feet away from the County's right-of-way. (*Id.* at 16.) Rather, blading operators focus on whether "there's no one ahead of them; no one that can hit them, and then they're focusing on their blade itself because you don't want to clip utilities." (*Id.* (quoting Gay Depo. at 9).) As such, the County asserts Plaintiffs have not shown it knew or should have known that the berm created a dangerous condition.

The Court finds there are questions to be answered by the jury, which may draw different inferences from the evidence that are less favorable to Plaintiffs. *See Bean v. Costco Wholesale Corp.*, 561 F. Supp. 3d 915, 923 (E.D. Cal. 2021). Thus, the Court finds a genuine dispute exists as to whether the County had constructive notice of the dangerous condition and **DENIES** Plaintiffs' motion for partial summary judgment as to this issue.

## IV. CONCLUSION

Based on the foregoing, the Court:

1.   **GRANTS** CVWD's motion to exclude expert opinions of David Fractor, (Doc. No. 103);

2.   **GRANTS IN PART AND DENIES IN PART** the County's motion to exclude expert opinions of Ilene Zackowitz, (Doc. No. 104);

3.   **DENIES** the County's motion to exclude expert opinions of David Casteel and Robert Thompson, (Doc. No. 105);

4.   **GRANTS** the County's motion to exclude expert opinions of Edward Ruzak, (Doc. No. 106);

5.   **DENIES** the County's motion to exclude expert opinions of Reza Marshal, (Doc. No. 107);

6.   **DENIES** Plaintiffs' motion to exclude the Kimley-Horn Study, (Doc. No. 110); and

7.   **GRANTS IN PART AND DENIES IN PART** Plaintiffs' partial motion for summary judgment, (Doc. No. 109).

**IT IS SO ORDERED.**

Dated:  September 10, 2022

Hon. Anthony J. Battaglia
United States District Judge

20-cv-01800-AJB-RBM